## Appeal of UNITY SCHOOL OF CHRISTIANITY.

Docket No. 1799. Submitted February 4, 1926. Decided April 23, 1926.

A corporation otherwise exempt from tax is not deprived of exemption because it carries on profitable or competitive activities in furtherance of its predominant religious, charitable, scientific, or educational purpose.

*Arthur B. Foye, C. P. A.*, and *J. F. Pflug, C. P. A.*, for the taxpayer.

*Briggs G. Simpich, Esq.*, for the Commissioner.

Before Sternhagen, Lansdon, and Arundell.

The Commissioner determined deficiencies for the fiscal years ended April 30, as follows: 1917, $399.09; 1918, $390.62; 1919, $17,394.70; and 1920, $14,280.29; a total of $32,464.70. The petitioner contends that it is exempt from tax under section 11 (a) (sixth) of the Revenue Act of 1916, section 201 (b) of the Revenue Act of 1917, and section 231 (6) of the Revenue Act of 1918; and, if it be not wholly exempt, it is nevertheless entitled to the exclusion from gross income of certain amounts received, as it contends, as gifts.

### FINDINGS OF FACT.

The Unity School of Christianity is a corporation created on April 14, 1914, under the business corporation law of Missouri. The articles of incorporation contain the following:

Seventh—That the corporation is formed for the following purposes: The purposes of this corporation are to establish and maintain a School, Institute or College, for the instruction in and the promotion of Christianity and the principles and studies for the intellectual, moral, spiritual and physical development and improvement of mankind, and for the promotion of the harmony, health and happiness of mankind, and to apply such principles and teachings for such purposes, including the treating of diseases and ailments of persons anywhere; and also in connection therewith, to further carry out these objects, this corporation shall have power to establish and maintain a sanitarium for the treatment and healing of diseases and ailments of persons, and to receive and treat patients; to furnish food and other aids and necessaries recommended by this corporation; to use all lawful and usual methods and means of educating, aiding and treating its students and patients; to provide such instruction and aid to persons who personally attend the courses of study and instruction, as well to those who are at a distance; to grant diplomas and confer degrees on its students who are deemed proficient and fitted to receive them.

For the accomplishment of these objects it has power to establish branch organizations; to establish a library or libraries; to print, publish and bind and distribute such books, magazines, papers and other literature as will further carry out the objects of this corporation. To lease suitable buildings

and equipment, and to acquire by purchase or gifts such personal and real property as may be necessary to carry out the objects of this corporation; and to receive subscriptions and donations of real and personal property to be applied to the uses and purposes of the corporation; to take, hold, and manage real and personal property conveyed to it in trust, the income from which is to be applied to the uses and purposes of this corporation, and to execute such trusts; to mortgage or otherwise encumber any of its property, or to sell and convey the same; to permit the use of any of its property for religious, educational, benevolent, or other lawful purposes.

On April 29, 1921, there was duly added to the first paragraph quoted the following:

Provided that no dividends shall ever be declared or paid but all profits and property of this organization shall be used to carry out the purposes of the organization or some part thereof.

The work of the corporation and the idea underlying it originated in 1886, when the founder, Charles Fillmore, and his wife, Myrtle, determined to devote themselves to spreading the belief that physical healing and spiritual elevation were inherent in what they regarded as right thinking as it had been revealed to them from a study of the Bible and the teachings of Jesus. They regarded all unhappiness and physical ailment as subject to being completely overcome by directing thought into the channels of love, justice, and righteousness. They regarded the teachings of Jesus, as found in the Bible, as expressing the fundamental religious truths, but they believed that these truths were equally effective to assist all persons irrespective of sect.

The prinicipal feature of the movement is what is called "silent unity," the underlying idea of which is the efficacy of silent prayer and devotion simultaneously made by persons in various places. For example, at 9 o'clock each evening everyone throughout the world is asked to join in prayer wherever they may be. As a result of this practice many people have expressed their belief in its effectiveness to bring them relief from bodily and other pain. To-day the membership in silent unity exceeds 100,000 persons throughout the world.

The means of communication and propaganda originally adopted was the publication of periodicals and tracts, and this has continued to be a substantial means of communication and expansion.

Long before the incorporation, the Fillmores and their two sons were occupied entirely with the Unity movement and had devoted their property to it. They organized the corporation because they believed that by so doing the work would be carried on more conveniently and more impersonally. They then transferred their property, including real estate, to the corporation in exchange

for its entire 50 shares of stock of $5,000 par value, which was divided equally among the four. The corporation was organized under the business corporation law instead of that for religious and charitable corporations, because they were advised that their desire to print literature made this necessary. They did not intend to pay dividends to the stockholders; no dividends have been declared or paid, and all earnings have been used for the purposes of the movement.

On August 3, 1918, the four Fillmores, who owned all the stock, made and published the following declaration of trust:

Whereas, the undersigned are the legal owners and holders of all the capital stock of Unity School of Christianity, and corporation of Missouri; and,

Whereas, we have by good management largely increased the number of members and adherents of the School, and have also made material progress and gains for the corporation; and in accomplishing this result have been aided and encouraged by the many members enrolled and adherents of the School.

Now, therefore, Know All Men By These Presents, that we, Charles Fillmore, Myrtle Fillmore, Lowell Fillmore and Royal Fillmore, the undersigned, being desirous of firmly establishing, further promulgating and of perpetuating the principles and teachings of Unity School of Christianity as the same now are established and taught by us and expressed in the printed books, magazines and pamphlets issued under our direction or with our approval, and as these principles and teachings may be added to or corrected from time to time; and desirous of being helpful generally in all matters pertaining to education and in fixing high and broad ideals and standards of correct living and thinking for all persons, and more particularly for all persons who are now or may be hereafter enrolled on our books as members or adherents of the School aforesaid.

Do now DECLARE that we hold all our right, title and interest in said corporation (represented by said capital stock) in trust, and dedicate same to be used to carry out the purposes herein expressed and referred to, so that all persons who now are or may hereafter be members and adherents may, while so enrolled and upon proper application, receive the benefits of all the principles and teachings and other help that the School can give; reserving, however, to ourselves and our successors the right to manage and control the business and properties, and to a reasonable compensation for our time and services, and to name our successors who will carry out the purposes herein declared.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 3rd day of August, 1918, at Kansas City, Missouri.

CHARLES FILLMORE    [SEAL]
MYRTLE FILLMORE    [SEAL]
LOWELL FILLMORE    [SEAL]
ROYAL FILLMORE    [SEAL]

This was published in an attempt to put the property entirely out of the hands of the Fillmores as personal owners and to make it clear to others that they did not regard it as belonging to them personally.

The amendment to the articles of incorporation, which was made on April 27, 1921, to the effect that no dividends would ever be declared or paid, was adopted because the Fillmores wanted that fact to be made plain. They had never declared any dividends and they wanted to fix it so that none of their successors could declare any dividends.

On June 22, 1923, the following declaration of trust was made, signed and published by the Fillmores:

### DECLARATION OF TRUST

WHEREAS, the undersigned incorporated the Unity School of Christianity in April, 1914, as stockholders and directors; and,

WHEREAS, the articles of association of said Company were amended on April 29th, 1921, by adding the following to the business purposes stated in said articles, to-wit: "Provided, that no dividends shall ever be declared or paid, but all profits and property of this organization shall be used to carry out the purposes of the organization or some part thereof"; and,

WHEREAS, the undersigned claim no right or private property in the shares of stock of said corporation, but hold the same in trust for the purposes set forth in said articles of incorporation;

Now, THEREFORE, the undersigned, and each of them, do herein and hereby, jointly and severally, for themselves, their heirs and assigns, disclaim any right of private property in and to the shares of stock of said corporation and publicly declare that the same are now, and shall be at all times held in trust by the undersigned and their successors as Trustees for the purpose of carrying out the purposes for which this corporation was organized as set forth in said articles of association as amended during the life of said corporation and, so far as lawfully may be done, during the existence of said corporation by extension of the time under the laws of the State of Missouri or any corporation or organization that may lawfully and properly succeed it, and, as part of this declaration, said shares of stock in said corporation are hereby placed with and entrusted to the undersigned and their successors as Trustees for the purpose of voting the same at any and all meetings of said corporation or its successors, the object and purpose of this declaration of trust being, in every lawful way, to perfect and carry on the work in all its branches necessary and proper to be done in carrying out the purposes of said corporation as set forth in its said articles of association as amended.

This declaration of trust shall be spread upon and become a part of the records of this corporation.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 22 day of June, 1923.

CHARLES FILLMORE [SEAL]<br>
LOWELL FILLMORE [SEAL]<br>
ROYAL FILLMORE [SEAL]<br>
MYRTLE FILLMORE [SEAL]

Thereafter and ever since the certificates of stock of the corporation have carried the statement that they are issued and owned subject to the two declarations of trust dated August 3, 1918, and June 22, 1923.

The four Fillmores reside on the property of the association and pay rent to it. As officers of the corporation their salaries during the years in question were as follows:

|  | 1916 | 1917 | 1918 | 1919 | 1920 |
|---|---|---|---|---|---|
| Charles Fillmore | $2,600 | $2,600 | $2,600 | $3,600 | $3,725 |
| Myrtle Fillmore | 2,080 | 2,080 | 2,080 | 2,250 | 2,600 |
| Lowell Fillmore | 1,820 | 1,820 | 2,040 | 2,165 | 2,945 |
| Royal Fillmore | 1,320 | 1,560 | 1,775 | 1,655 | 2,570 |

The department of silent unity of the present organization is devoted primarily to the education of its members. It is "a school of religious research, inquiry and study." The members, who number approximately 100,000, write in "for help in health, happiness and prosperity, and all things connected with their daily lives." The purpose of the school is through correspondence to teach members or students who are ill or unhappy "to change their minds; they are thinking along wrong lines; they must apply a little of the law of love and the law of justice and righteousness, and in that way start into a new trend of thought." The founder testified:

We have various ways of handling those cases, according to the character of the case. Sometimes we all get together and pray. We have what is called the silent prayer method, and we follow out there the command of Jesus that we should get together in His name. We recognize that Jesus Christ is the head of the work; that Jesus Christ is right here in our midst today carrying on His work. We are one department of that work. We reach such a state of consciousness that we function through a spiritual ether very much like the radio. People who follow our teachings lay down the personal and rise into the spiritual, and get the consciousness that we have. It is not only a psychological consciousness, but it is a teaching. We teach the people directly what we think they should do, especially as to the law of love and justice and righteousness, trying to iron out all the differences in life, as we recognize the difference in life of any man is the result of discord in states of mind, so that silent unity is primarily a part of the correspondence school, and the work of that deparment is their teachings, but to their teachings they add this inner spiritual power which helps people through their faith and better understanding. * * *

Q. Is there ever any charge made for the prayer to those who ask for the help of silent unity?

A. No, sir. We started out with this proposition, that we should never charge for our spiritual work, that prayers could not be paid for, and that following the early Christians, we gave without money and without price.

Q. How is it that you receive income through the silent unity?

A. Just as any other religious school needs help. Our people understand that we are supported by a free-will offering. In other words, we have no other source of income except through tithes.

The organization has several departments and sources of income. The principal department is silent unity and the principal source of

income is received from those who regard themselves as benefited. These amounts are not solicited, although in some cases they are given by reason of specific benefit or service received. No service or help is given by the association expressly in consideration of compensation received. Such service or assistance is given freely and the incoming revenues are regarded by the petitioner as free-will contributions.

The other departments are as follows: Publications, inn or cafeteria, farm, reading room and library, field work for the encouragement of unity centers and study classes, good words club, radio, and silent seventy.

There are several publications, including "Weekly Unity—Practical Christianity for Practical Christians," "Monthly Unity—A Magazine Devoted to Christian Healing," "Wee Wisdom—A Child's Magazine Devoted to Practical Christianity," published monthly. There are also numerous books and pamphlets, such as the Wee Wisdom picture books, consisting of compilations for children of pictures and poems taken from "Wee Wisdom." There are various illuminated and illustrated copies of mottoes and poems, all of a similar character, such as those entitled "A Real Friend," "Father," "The Lord's Prayer," "Truth," "Love's Service." A publication called "The Unity Inn Cook Book" contains a selected group of vegetarian recipes for the purpose of establishing that good palatable and nutritious foods can be prepared without meat and in keeping with the association's belief that it is unnecessary to destroy life in order to live. No advertising has ever been solicited or accepted for any of the publications. Sometimes the publications produce a gain and at other times a loss, and from May 1, 1916, to April 30, 1921, there was a net loss of $26,828.44.

Some of the books are sold in general bookstores. In respect of the children's books "the idea was not to make money on it; the idea is to get that book out so that we won't lose anything on it, and at the same time get it into the hands of as many children as we can, that is, get the cost as low as possible, consistent with what it actually costs to publish and distribute. We don't seek to make a profit on it."

"The purpose of operating the inn was to demonstrate that a good appetizing, satisfying and substantial meal could be served without meat." It serves the public in general and is not confined to members of the organization. For the entire period from May 1, 1916, to April 30, 1921, it has been conducted at a loss of $9,787.54.

The farm is a recreational place for unity workers and produces some food for the inn, but not enough to supply all of its needs. Eventually the farm is intended to become the headquarters of the entire organization so that it may move out of the city and have room

enough to expand. The expense of producton for the two years ended April 30, 1921, was $8,413.95 in excess of the amount received from the inn for produce delivered.

The reading room and circulating library is open to the public without restriction and furnishes information about books. Unity literature is sold there for the purpose of furthering unity work.

The department of field work is for the promotion of unity centers throughout the world to encourage the spread of unity teaching.

The good words club was organized to promote the use of constructive language to take the place of " idle words, slang, criticism, faultfinding and all those things that are not good for life."

The radio is used to broadcast church services on Sundays, devotional services on Tuesday evenings, an educational and popular program Thursdays, and a popular and a healing service program Saturdays.

The silent seventy is an organization for the distribution of free tracts and literature.

None of these departments is conducted for the purpose of making a profit. A detailed cost accounting system is maintained so that each of these departments may fix its prices so as to yield as nearly as possible no more than the cost of maintenance and operation.

" Financial gain is not the end to which the activities of the corporation are directed; in no case."

### OPINION.

STERNHAGEN : The petitioner claims to be exempt from income and profits taxes by virtue of the provisions of the revenue acts in effect during the taxable years in question, which provide that the following organizations shall be exempt from taxation thereunder :

Corporations organized and operated exclusively for religious, charitable, scientific, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual.

This is section 231 (6) of the Revenue Act of 1918, and the Revenue Acts of 1916 and 1917 contain a substantially similar provision for exemption.

This provision is similar in all respects, for the purposes of the present proceeding, to that considered by the Supreme Court in *Trinidad* v. *Sagrada Orden de Predicadores*, 263 U. S. 578. It is apparent that the court regarded the general purpose and the primary functions and activities of the organization as the principal matters to be considered. That is to say, a corporation failing in the primary attribute of being a religious, charitable, scientific or

educational organization requires no further consideration, for it is in no event within the exempting provision. If it be not one of this class, it is unnecessary to consider the remaining qualifications prescribed by the statute, since they are only restrictions upon corporations of the principal character exempted. In the *Trinidad* case it was stipulated that the plaintiff was organized and operated for religious, benevolent, scientific and educational purposes, and that it had income from rents, dividends, interest, alms and the sale of stocks, wine, chocolate and other articles. In behalf of the Government it was contended that the plaintiff was not operated "exclusively" for religious, charitable or educational purposes, but that its sales were matters of business which prevented it from being exclusively of the character required by the statute. The Government's contention was described by the court as follows:

The defendant concedes that the plaintiff is organized and operated for religious, charitable and educational purposes and that no part of its net income inures to the benefit of any stockholder or individual, but contends that it is not "operated exclusively" for those purposes, and therefore is not within the exception in the taxing act. Stated in another way, the contention is that the plaintiff is operated also for business and commercial purposes in that it uses its properties to produce income, and trades in wine, chocolate and other articles. In effect, the contention puts aside as immaterial the fact that the income from the properties is devoted exclusively to religious, charitable and educational purposes, and also the fact that the limited trading, if it can be called such, is purely incidental to the pursuit of those purposes, and is in no sense a distinct or external venture.

The court held against this contention and said:

Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain. Such activities can not be carried on without money; and it is common knowledge that they are largely carried on with income received from properties dedicated to their pursuit. This is particularly true of many charitable, scientific and educational corporations and is measurably true of some religious corporations. Making such properties productive to the end that the income may be thus used does not alter or enlarge the purposes for which the corporation is created and conducted. * * *

* * * In using the properties to produce the income, it therefore is adhering to and advancing those purposes, and not stepping aside from them or engaging in a business pursuit.

In respect of the transactions in wine, chocolate, and other articles, it was held that they were "incidental to the work which the plaintiff is carrying on. That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed."

The argument of the Commissioner here is similar in effect although substantially different in its emphasis. It is said that the

several departments of the corporation, such as the inn and the publications, are conducted in competition with purely commercial ventures, so that every meal served at the inn takes so much from a competing restaurant and that each book sold deprives another publisher of a similar sale. This, it is said, deprives the corporation of an exclusively religious, charitable or educational character. As the basis for this contention it is apparent that the Commissioner relies upon the incidental statement by the court in the *Trinidad* case that "it is not claimed that there is any selling to the public or in competition with others."

For the purpose and operations of this corporation we must look to the evidence, and it is manifest that the entire reason for its existence is an altruistic purpose to promote a religion and the spiritual welfare of mankind. If for some unforeseen reason the corporation were no longer permitted or enabled to fulfill this purpose, it would have no cause to continue in existence. Religion and education dominate its activities and all else is incidental to this end.

Can it then be said that the financial aspects of the conduct of the inn or of the farm or of the publication of the books and periodicals are such as to make the statutory word "exclusively" inapplicable? We think not. There is nothing in the statute which justifies the Government's emphasis upon the competitive aspect of its selling. The inquiry must always be whether all of the activities of the organization in question are devoted to furthering its predominant religious, charitable, scientific or educational purpose— are all of its activities designed and carried on to advance religion, charity, science or education? If these purposes or any of them are the controlling reasons for the corporation's existence and all things are devoted by it to that end, the congressional purpose of exemption, "made in recognition of the benefit which the public derives," should not be defeated because its incidental features are to some extent profitable. It is only when such profits or net income are used for private rather than public benefit that Congress has taxed them.

It is said that the fact that the incorporation was under the business law is indicative of its commercial purpose. This might be significant if not otherwise explained, but it is not conclusive. A corporation so organized is not, merely because it is permitted thereby to engage in business, precluded from an exclusively charitable purpose. The purpose of its organization and operation is still a question of fact, and the evidence may be such as to show that its purpose was charitable despite the ordinary implications of the statute under which it was created. The suggestion also arises that the stated purposes expressed in the charter are entirely consistent

with a corporation to be conducted for private gain—that a school or a sanitarium is not necessarily charitable or non-profitable. And this, indeed, is true. By its charter this corporation might lawfully have been used as the means of increasing the wealth of its founders and stockholders. But the evidence is all to the effect that this was never the purpose or intent and has not been the effect. Looking to the purpose, as the statute requires, it becomes a question again of fact, as disclosed by evidence, and this is not determined by what might otherwise have been consistent with the charter.

In considering whether a corporation is religious, charitable or educational, we must always be guided by the character of the organization and its activities. Religion is not confined to a sect or a ritual. The symbols of religion to one are anathema to another. What one may regard as charity another may scorn as foolish waste. And even education is to-day not free from divergence of view as to its validity. Congress left open the door of tax exemption to all corporations meeting the test, the restriction being not as to the species of religion, charity, science or education under which they might operate, but as to the use of its profits and the exclusive purpose of its existence.

We are of opinion that the purpose of the petitioner is within the statute, that its financial activities are only incidental to this purpose and do not change it, and that its earnings are all devoted to this purpose. The petitioner was therefore exempt from tax and there is no deficiency.

*Order of no deficiency will be entered.*